the last case of the morning. 313-869 Bolingbrook Police Department v. Michael Tolles. Counsel, you may proceed. Thank you. Good morning, Your Honors. Joseph Basil here on behalf of the appellant Bolingbrook Police Department. Good morning, Counsel. We have a case that presents two focal issues here. The first is a legal issue as to whether what the activity of Mr. Tolles or Officer Tolles on February 17, 2009, was in the course of and arose out of his employment. And our position is that, and we submit to you, that what he was doing that morning was simply preparing to go to work. The lifting of the duty bag, as he calls it, when he was going to put it into the trunk of his car was, first of all, our position is he was not in the course of his employment at the time, and the lifting of the duty bag was not a risk unique or an activity that was incidental to his duties as a patrol officer. Can he operate without his duty bag? No. Can he operate without what's in the duty bag? Of course not. Okay. Was it reasonably foreseeable to his employer? I don't think so, because there was no requirement that he take the duty bag with him. He had a lock. Wasn't there testimony that they all knew he'd take it home, that all these guys took it home? Officer Tolles testified to that, but he also admitted that there was no requirement for him to bring the duty bag with him. I believe what he really testified to was that he was doing this simply to make it easier for him so he didn't have to go into the locker room and bring it out to his car, or his squad car, that is, once he arrived at work. Does he wear, does he put a uniform on, he has to wear a uniform? I would hope so, yes. I don't know. Yes. Well, I know that, you know, that wasn't asked in the trial, but I'm assuming, yes, he does. So he puts his uniform on at home? I would think so, correct. So if he tightens his belt too tight and gets injured, does he have to wear a uniform on? That's a possibility. I submit it would not be. Oh, okay. Is he a traveling employee? No, Your Honor. He's not? I don't believe so. He's not a traveling employee? Not in the circumstances, not in the circumstances of this case. A traveling employee is covered from the time he leaves his house until the time he returns to his house. This happened after he left his house. Well, I believe he's actually in the garage. Well, okay, but he's out of the house, he's on his way to work, right? Put the bag in the car? That's correct. Pardon? So why isn't he covered as a traveling employee? Because of the... If it arose out of the course of his employment. The reason I believe he's not a traveling employee is the case law that says the, that when you're going to and from work, that is not... That's not, that's for non-traveling employees. That's not for traveling employees. I, I... Traveling employees are covered from the time they leave their house until the time they return. Absolutely. So that includes travel back and forth to work? If you're a traveling employee, I don't believe the patrol officer is a traveling employee. Well, where does he do his work? In a chair? Inside the police station? He drives in a car? He goes all over the place. But the Keller case that we cite talks about a patrol officer who was on his way to his police station, driving his own car, and at the time he encounters what he perceives to be a reckless motorist. And he decides to take action and apprehend the individual driving recklessly to issue him a citation. I believe the court in that in the course of his employment, the appellate court made the determination that at the moment he assumed or took action as a patrol officer, that is to apprehend the reckless motorist, he then was in the course of his employment. If he were a traveling employee, it wouldn't have made a difference. Why? Does every traveling employee, everything that they do, they have to be considered, I believe, reasonably foreseeable, Your Honor. Well, my only question is, this guy testified that he put his duty bag in the trunk of his car and took it home to protect it so it was safe, and because it saved him the trouble of walking to his... To the locker? Locker or something on that order. Take it out, carrying it back and forth instead of... And so, and there's absolutely no question that the employer should anticipate that this guy would bring his handcuffs with him, his helmet, his gas mask, and whatever else he had in there. So that's not difficult. So is this case to be decided on the question of whether the injury occurred out of and in the course of his employment, arose out of, or is it to be decided on causal connection? Well, I think both. You would say both? Our position is both, Your Honor. How can there be no causal connection? Can you make that argument? I can, yes. Well... As we state in the brief, first of all, we know, there's no question that Officer Toles had a long, chronic lumbar spine condition. No question about that. No question about that. In November of 2008, he sees his chiropractor, whom he's been seeing for a number of years. He had a pre-existing herniated disc. Apparently... Oh, yes, that was diagnosed on MRI when he saw Dr. Matagaris. I don't know how to say the name. Before the incident with the duty bag. I beg your pardon? That was diagnosed long before the incident with the duty bag. That's correct. Okay. And he starts treatment for it, before the incident with the duty bag. And then we get to the visit on February 13 of 2009, where now admittedly these notes of Dr. Matag... I have trouble with his name... with the treating doctor and surgeon, indicate that they discussed all treatment options and that Officer Toles was going to consider what they would... what he would do. Now, Officer Toles testified they did not discuss surgery. Dr. Matagaris testified they did. But we do know... That he called the therapist. That he called the therapist. And here is the significant statement he makes. He talks about the fact that he's going to stop therapy because he's probably going to have surgery in the next two weeks. And it goes on. There's no reason the therapist would have wrote these details had he not been... had he or she not been told. The therapist's note says the doctor is... I have a... I have a very severe nerve impairment or impingement. And the next step is to remove cartilage. All right. So it appears that there's some evidence that he may have already decided to have surgery. You're going to argue that why would he have called the therapist's office and cancel the therapy if he had no idea he was going to have surgery? Well, and not only that, where did he get the notion that cartilage was going to be removed? Had he... Can I ask you a question? Yes, Your Honor. He denied that he had made a decision to have surgery prior to this event, didn't he? In his testimony, I believe that's correct. And credibility is... That's a commission. That's a commission. So he denied that he was going to have surgery until after the after, didn't he? I believe that is correct. He said... He testified he never decided to have surgery until... After... What, the 19th or the 18th? He saw a doctor on the 18th. So what is your take then? You're saying, okay, so he calls the therapist, he says he's, you know, going to discontinue the therapy, and then the incident with the bag happens. So what are you telling us? There was no change in the condition. It's a condition manifestation. Well, wait a minute. We're going to get back into this argument. A symptom manifestation. We're going to get back into this argument as to whether symptom manifestation is an injury or it isn't. Didn't his doctor say that the event with the bag increased his pain to the point that he required surgery? That was his testimony. That was his testimony. Yes. So if the incident from the bag did increase his pain to the point where he needed surgery, isn't it then a cause? Not in this instance, because he's symptomatic before. There's a discussion of surgery before. He goes into detail with the therapist as to what the procedure would involve. Okay, but what you're saying makes some sense here. And you're going to say Miller, quite frankly, will find clearly the lifting incident had nothing to do with his need for surgery, right? Well, I was going to get to that, yes. You don't need to. That's what Miller's saying. That's correct. Fully contrary to Manarangas, okay? Right, and I recognize it's a medical determination. I guess therein lies our problem. As far-fetched as you think that the testimony of the doctor is and these unusual circumstances, yes, you're pointing to, that happened in the interim, the commission still has to weigh the evidence and the credibility, doesn't it? There's no question about that. So how do we end up reversing it? I'm suggesting to you that the commission's decision on causation is contrary to the manifest weight of the evidence. Well, why is that? Because you have physical therapy notes on one hand, which are what you're basing your argument on, and you have the claimant's testimony on the other hand, denying that he told the therapist what's contained within the therapist's notes. That's a credibility determination, as has already been determined. Then there's also the surgeon's testimony that on February 13th he did not recommend surgery. So you also have that testimony at that point. There may have been discussions regarding what could happen in the future, but there had been no surgery recommendation made at that point. And so you really do have countervailing evidence that the commission was charged with determining the credibility of. The difference here, though, is the fact that when he discusses this with the therapist, it's clear he's saying I'm going to have the procedure in the next two weeks. Wait a minute. He denied saying that. He testified he never made that comment. You're saying who would be believable? I know what you're saying. You're going to say, and it has some intuitive appeal, I would concede. Why would he tell a therapist he's discontinuing therapy, and we'll ask your opposing counsel if he's not contemplating surgery? Seems a little strange. And yet the commission, you know, apparently believed him when he denied it over the therapy notes. As strange as that may seem to us, don't they have the right to do that? They have a right to do it. I just think that that's against the manifest way of the evidence because of the fact that we know he has had this condition for quite a long bit of time and that anything that he does can aggravate that low back condition. Dr. Miller, and again, I recognize we're dealing with manifest weight on causation. Dr. Miller testified that pain is subjective. The condition he has, the pain is going to vary from day to day. The records show... Miller says the condition didn't change at all, right? He also said that. The duty bag incident didn't change his condition. Didn't aggravate or accelerate. There's no... You know, it probably would have been great if we had an MRI taken after the duty bag and compared it to the early one. Dr. Madagaris, I'm sorry, I have trouble with the name. Dr. Madagaris didn't do that. They just went forward the very next day to have the procedure. Let me ask you a very pointed, succinct question. I beg your pardon? Let me ask you a very pointed, succinct question. If we were to reverse the commission on the manifest weight issue, how would we do so without running afoul of that very well-settled maxim that runs through all these cases? We cannot substitute our judgment for the commission on matters of credibility and weight of the evidence. How would we do that in this case without violating that rule? I don't think it would be a violation of the rule for the simple reason that there's enough... There's substantial evidence here to show that this man was a surgical candidate. I know I'm using the term Dr. Madagaris didn't agree with, but the cumulative weight effect of the evidence is such that this man was... It was inevitable that he was going to have the surgery. Even if that's true, if they believe Madagaris that it accelerated the need, isn't that a basis to support the commission's decision? It would be, but for the fact that we believe what happened with the duty bag was nothing more than a manifestation of this preexisting condition. Anything he did could have increased his pain to where he goes back to the doctor and says, look, it's hurting more. What do we do? And you're making a very logical argument. I'm trying. Hopefully you've done that in front of the commission. I wasn't there at the time. It wasn't me then. I'm done, right? Time's up. We have a couple more minutes. No, I think... Okay. I'll respond. Yes, you have time on reply. Thank you. Counsel, you may respond. Your Honor, my name is Jay Johnson. I represent Petitioner Michael Toles in this matter. Obviously, we ask that the decision of the commission in the Will County Circuit Court be affirmed in its entirety. We do believe the petitioner did suffer a work accident that rose out of and in the course of his employment. That question focuses around the duty bag. The duty bag obviously contains instruments, equipment, ammunition. I think that's easier to get past, but the question is, as you know, and you've heard all the questions, okay? You've got a guy who admittedly has had a bad back for years. Correct. You're not disputing that. You can't dispute that. No, the medical records support that. Herniated disc. He's a candidate for surgery because Dr. Madrangas wouldn't have discussed surgery with him if he wasn't a candidate, okay? He calls in, allegedly calls in the therapist, according to some evidence, and cancels the therapy, okay? Sounds like surgery was inevitable for this man anyway. So why did the commission get it right? Well, if you look back at the therapist note from February the 3rd of 2009, it shows that his condition had improved. He no longer was complaining of pain. That's the reason why he didn't continue on with physical therapy. But the notes say that he was contemplating surgery, though, don't they? I mean, the notes are to be believed. The therapist notes? Yes. I think that if he talked about surgery with the doctor, that was one of the things that was talked about, but there was no recommendation for surgery made. The lifting incident clearly pushed him over the edge to the need for surgery. Dr. Mataragos went into detail in his testimony as to how the mechanism of injury, the bending and the lifting, could have aggravated that condition, made that condition worse, leading to the need for surgery. Dr. Miller even agrees that the type of injury as described could have caused an increase in pain. I think it's important to know that. If we accept the notion that there's a dispute in medical opinion, and that's for the commission to decide, that establishes causation. Let's start talking about whether this arose out of him in the course of his employment. Tell us why. Was he a traveling employee or wasn't he? I think that there's an argument that can't be made that he was a traveling employee. So now the question becomes, as a traveling employee, when he starts loading his equipment into the trunk of his car at home, does that arise out of him in the course of his employment? It does. And, Your Honor, the reason why I believe that it does is he's taking steps necessary to perform his job duties. He needs the duty bag to perform his job duties. It contains, as I said earlier, the additional ammunition, handcuffs, code books, everything he needs to perform his job duties. He travels with that duty bag in his patrol car. So to get that duty bag to his work, to his patrol car, he must travel, he must move it there. So if a person is a teacher in a high school and uses a textbook and on a wintry day they put their textbook under their arm and go to get into their car and slip and fall and break their coccyx, can they recover for that? They may be able to recover for that. What's the reason for that? They're not traveling employees. They're not traveling employees, no, Your Honor. But the reason why that could be a compensable case is if that textbook was necessary for that teacher to perform the job duties of a teacher and it's reasonably foreseeable that that teacher, and many teachers do work from home, the teacher may have taken that textbook home to prepare lesson plans. So if the reason for the fall was carrying the textbook, which directly related to the employment, yes, I would make the argument that that would be a compensable fall. Let me ask a couple questions about what facts are in the record. He was loading his bag into his personal vehicle? Correct. And so then he was going to drive his personal vehicle to the police station? Correct. Where he would then get into his police vehicle? Yes. Okay. So his work didn't really commence as far as his actual policing activities until he arrived at the police station? I would disagree with that. I think that while driving in he is a police officer. In fact, he's always a police officer. So, I mean, he might see somebody getting mugged on the side of the road, pull his personal vehicle over and make an arrest. Exactly. Or he could pull over to assist a stranded driver. No, he was in uniform when this happened. When this happened? Yes. I could not tell you that. Is the record whether he was or wasn't? Did he have his gun on? He typically would have his duty belt on, he would have his gun on, but he still had the duty bag. He's moving the duty bag. I understand that. But I want to know, is he in his uniform? Does he have his gun on his hip? And is he putting the bag in the car getting ready to go to work? The record reflects that is really the question. I don't know if the record, I don't recall if the record reflects that. He could have changed into uniform at the police department. He could have changed into the uniform at the police department. We don't know. Correct. Of course, policemen are going to argue they're policemen 24 hours a day. We just have black letter law, all policemen, everything basically they do is in the course of employment. That's what Arbitrator Fraudiani had filed. Does the case law say that? That was the commission's decision. I understand that, but does the case law say that? I don't think the case law is clear on that. I mean, a policeman working, plane closed, decides to go into a tavern and have a few pops for lunch. He's working 24 hours a day, is he covered? When he slips and falls in the washroom? Sure. If that's the case, is he covered? If he stops in for a tavern for lunch as part of his job duties? He would be, I would say in that circumstance, he would be a traveling employee. Having a few drinks at lunch and slips and falls in the washroom? In the tavern, yeah. If we're talking about that, if we take this argument, this is a personal comfort doctrine case. Well, I don't think this is a personal comfort doctrine. Well, it can rise to that level if he's, if Respondent's position is that this is a deviation, and the only reason why he moved the duty bag was for his own ease. Well, he isn't going duck hunting. He's not going duck hunting, no. So we know that. He's not loading his shotgun and heading for the duck point. He would only do that if he came from Peoria. But there's acquiescence by the employer in taking the duty bag home? Well, there clearly is. He testified to the fact that he could either keep it in a locker or that he, there's duck hunting in Oswego, too. I watch the guys out in the fields by my house. I don't know. See the ducks and do anything. Or is it geese? It's geese. You can't show that they're protected. Okay. Oh, yeah, it's, it's, it's. Yeah, the employer certainly acquiesced in that. Mr. Toles testified that he was allowed to take the duty bag home for safekeeping. He testified many officers did. And they did that so they didn't have to lug it because it is heavy. And that goes to the point about the increased risk. It's a 40-pound bag that these officers have to tote around. That is an increased risk not faced by the general public. It's maintaining, caring for, carrying, using that duty bag as part of the day-to-day job that that officer, that those officers perform. So if he cleaned his gun at home and it went off, that's in the courtship, too? Yes. I mean, his testimony here was he was on his way to work. Yes, he was. He was preparing to start his, he's driving into a shift. He, he had testified that he takes the duty bag out of his car, places it in his garage, obviously keeps it there for safekeeping so he doesn't have to drive around with it. But should we agree on this? There was no department regulation that required him to do this. This was just his procedure, correct? Yes. The regulation was that they maintain the duty bag. Well, he testified that they could maintain it at home. At the PD or at home. Or in his locker. So he was maintaining it. That's part of his job. But he wasn't required to bring it to work every day from his home, correct? That's, I want to pin that down. He didn't bring it to work every day. He was required to use the duty bag. He could have left it in the locker at work, correct? He could have left it in the locker at work. I mean, he didn't have to transport it to the PD every day, did he? That's, that's apparently what he does. He transports it every day to the PD. But his own choice. There's no regulation that says you have to take your duty bag home and bring it back in the next day, correct? There's, there's no regulation that goes to that. It was up to him. It's up to him, but he could have left it there. The regulation is, he testified that they had to maintain the duty bag. He was maintaining the duty bag. Whether it was in his personal vehicle or in his locker, he was maintaining his duty bag. He testified that he had to keep it on his person, and that's what he was doing. Thank you. Thank you. Thank you, counsel. Counsel, you may reply. Just a few items I would like to address. Justice Hoffman inquired, and I think you did too, Justice Holdridge, about whether or not the record showed whether Officer Toles had his uniform on. We don't know. It was not discussed. So I don't, we don't know if he was in uniform leaving the house or was going to change at the police department. One of you asked about a black letter rule of law that a police officer would be on duty 24 hours a day, and is that the interpretation of the case law? I submit to you it is not. Now, we did cite, see, there really isn't a lot of case law on this. Sienz is close, but obviously there was evidence of a deviation with the duck hunting. But the point of citing Sienz is for the reason to show there isn't a black letter rule of law. I mean, if we were to interpret that, any injury in the house arguably would be compensable because he's 24 hours a day, or he or she is 24 hours a day as a patrol officer. You don't think that would be a good rule? I beg your pardon? You don't think that would be a good rule? I submit to you no, Justice Hoffman, no. Well, what about this business they're supposed to carry their guns 24 hours a day? The guns? Yeah, policemen are supposed to be armed 24 hours a day. They're supposed to carry them all the time. Well, they keep them with them. I don't think they're wearing them to bed. Well, if they go out, they do. They're supposed to. I believe that might be true. And so when they go to the tavern, and they go to the washroom, and the gun falls down and shoots them in the foot, then they're covered, right? I would submit to you they are not. Why not? Because they're not engaged in an activity incidental to their duties as a patrol officer. It's not the same as – Regulations require them to carry that gun. Okay, accepting that is true. I still do not – So you wouldn't find my high school teacher covered when she falls and breaks her coccyx because she's holding her history book? Not when she's leaving the house to go to work. Okay. If she's at work. That's different. That's different. She's leaving the house. She hasn't started to work yet. Then that's the point I'm making on the facts of this case. And Keller supports it. Of course, our high school teacher wasn't a traveling employer, was she? Is this guy a traveling employer or isn't he? I submit to you, no, because of the fact that he's simply on his way to work. To his place of employment. To his place of employment. Where he chooses to live is his business. Venture Newberg says that in the cases before. I'm sorry. Let me ask a question. Yes, sir. Is there anything in the record – I mean, was he a patrolman? I mean, was there any testimony as to what he did as a police officer? You know, that's a good question because the record, as I recall it, does not discuss what his job duties were other than focusing on the fact that they were to maintain or keep control, if you will, of the duty bag. And as Justice Hudson was asking, the duty bag could be left in the locker. Officer Toles clearly said, you know, I wanted to be as smart as possible so I didn't have to take it out, carry it back, put it back into the car when I bring it back into the locker at the end of the day, and so on. I mean, it seems unlikely he would need a duty bag if he had a desk job. Well, that's true. But, you know, my question is, is there anything in the record that says does he – was his job – did he stay at the station or did he patrol? Did he stay at the station or patrols or anything? There is nothing in the record as to that. We know he had a duty bag. That's about all that we can – all right. Thank you for letting us appear before you. Thank you. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement and a written disposition shall issue. The clerk will stand at recess until 9 a.m. tomorrow morning.